Rosemary M. Rivas (SBN 209147)
rrivas@zlk.com
**LEVI & KORSINSKY LLP**
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 291-2420
Facsimile: (415) 484-1294

*Attorneys for Plaintiff*

*[Additional Counsel on signature page.]*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE VLADIMIR GUSINSKY REV. TRUST, Individually and On Behalf of All Others Similarly Situated, | Case No. 5:17-cv-2150 |
| Plaintiff, | CLASS ACTION |
| v. | **COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934** |
| EXAR CORPORATION, GARY MEYERS, RYAN A. BENTON, BEHROOZ ABDI, IZAK BENCUYA, PIERRE G. GUILBAULT, BRIAN HILTON, JEFFREY JACOBOWITZ, MAXLINEAR, INC., and EAGLE ACQUISITION CORPORATION, | JURY TRIAL DEMANDED |
| Defendants. | |

Plaintiff, by and through its attorneys, alleges upon personal knowledge as to itself, and upon information and belief based upon, among other things, the investigation of counsel as to all other allegations herein, as follows:

## SUMMARY OF THE ACTION

1.      This action stems from a proposed transaction announced on March 29, 2017 (the "Proposed Transaction"), pursuant to which Exar Corporation ("Exar" or the "Company") will be acquired by MaxLinear, Inc. ("Parent") and Eagle Acquisition Corporation ("Merger Sub," and together with Parent, "MaxLinear").

2.      On March 28, 2017, Exar's Board of Directors (the "Board" or "Individual

Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with MaxLinear.  Pursuant to the terms of the Merger Agreement, MaxLinear commenced a tender offer set to expire on May 11, 2017, and stockholders of Exar will receive $13.00 in cash for each share of Exar common stock.

3.     On April 13, 2017, defendants filed a Solicitation/Recommendation Statement (the "Solicitation Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4.     The Solicitation Statement omits material information with respect to the Proposed Transaction, which renders the Solicitation Statement false and misleading. Accordingly, plaintiff alleges herein that defendants violated Sections 14(e), 14(d), and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Solicitation Statement.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(e), 14(d), and 20(a) of the 1934 Act and Rule 14a-9.

6.     This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.     Venue is proper under 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Exar common stock.

9.     Defendant Exar is a Delaware corporation and maintains its principal executive offices at 48720 Kato Road, Fremont, California 94538.  Exar's common stock is traded on the New York Stock Exchange under the ticker symbol "EXAR."

10.     Defendant Gary Meyers ("Meyers") has served as a director of Exar since May 2008 and as Chairman of the Board since September 2016.  According to the Company's website, Meyers is Chair of the Corporate Governance and Nominating Committee and a member of both the Audit Committee and the Compensation Committee.

11.     Defendant Ryan A. Benton ("Benton") has served as a director and the Chief Executive Officer ("CEO") of Exar since May 2016.

12.     Defendant Behrooz Abdi ("Abdi") has served as a director of Exar since September 2012.  According to the Company's website, Abdi is a member of the Audit Committee and the Compensation Committee.

13.     Defendant Izak Bencuya ("Bencuya") has served as a director of Exar since February 2009.  According to the Company's website, Bencuya is Chair of the Compensation Committee and a member of the Audit Committee and the Corporate Governance and Nominating Committee.

14.     Defendant Pierre G. Guilbault ("Guilbault") has served as a director of Exar since August 2007.

15.     Defendant Brian Hilton ("Hilton") has served as a director of Exar since August 2007.  According to the Company's website, Hilton is Chair of the Audit Committee and a member of the Corporate Governance and Nominating Committee.

16.     Defendant Jeffrey Jacobowitz ("Jacobowitz") is a director of Exar.

17.     The defendants identified in paragraphs 10 through 16 are collectively referred to herein as the "Individual Defendants."

18.     Defendant Parent is a Delaware corporation and a party to the Merger Agreement.

19.     Defendant Merger Sub is a Delaware corporation, a wholly-owned subsidiary of Parent, and a party to the Merger Agreement.

## CLASS ACTION ALLEGATIONS

20.     Plaintiff brings this action as a class action on behalf of itself and the other public stockholders of Exar (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

21.     This action is properly maintainable as a class action.

22.     The Class is so numerous that joinder of all members is impracticable.  As of March 27, 2017, there were approximately 51,192,445 shares of Exar common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

23.     Questions of law and fact are common to the Class, including, among others, whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

24.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class.  Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

25.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

26.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company and the Proposed Transaction

27.     Exar designs, develops, and markets high performance integrated circuits and system solutions for the industrial, infrastructure, automotive, and audio/video markets.

28.     The Company's broad product portfolio includes power management, sensing and signal conditioning, interface, LED lighting, data management, and video processing solutions.

29.     Exar has design centers in Silicon Valley, California, and Hsinchu, Taiwan and has sales locations worldwide providing real-time customer support.

30.     On August 3, 2016, Exar issued a press release wherein it reported its financial results for the Company's fiscal year 2017 first quarter, which ended on July 3, 2016.  The Company reported that first quarter net sales of $27.1 million increased $1.8 million or 7% from the previous quarter's $25.3 million.  GAAP net income was $7.5 million, compared to the previous quarter's net loss of $0.4 million, and non-GAAP net income of $3.8 million increased $2.3 million or 152% from the previous quarter's net income of $1.5 million.  Additionally, GAAP diluted earnings per share were $0.15, compared to the previous quarter's loss per share of $0.01, and non-GAAP diluted earnings per share of $0.08 increased $0.05 per share from the previous quarter.  With respect to the financial results, Individual Defendant Benton commented:

> We are extremely pleased with our record setting fiscal first quarter results.  The team stayed focused on execution and delivered.  Revenue came in at the high-end of our guidance range, driven by 16% sequential growth in the Industrial market.  As anticipated, the impact of an additional week was offset by a reduction in channel inventory.  Non-GAAP gross margin from continuing operations outperformed our guidance range.  The impact of our on-going strategic shift of the supply chain to China continues to exceed our expectations, and is increasingly being complemented by growth in advanced product sales.  We had strong execution from Exar's core business, as non-GAAP EPS from continuing operations increased sequentially from $0.03 to $0.08.
>
> We strive to achieve operational excellence.  During the quarter, total non-GAAP operating income, including discontinued operations, of $7.3 million represented a record in Exar's 45-year history, a real testament to the strength of the Company's earnings generation.  We continue to focus and reshape the vision of Exar, and with our continued progress remain upbeat about our prospects.

31.     On November 2, 2016, Exar issued a press release wherein it reported its financial results for the Company's fiscal year 2017 second quarter, which ended on October 2, 2016.  The Company reported second quarter net sales of $27.6 million, which increased $0.5 million, or 2%, from the previous quarter's $27.1 million.  With respect to the financial results, Individual Defendant Benton commented:

> Exar again delivered solid financial results, with second quarter revenue, Non-GAAP gross margin and EPS from continuing operations all within our guidance range.  Revenue increased 2% sequentially, despite going from 14 weeks in the first quarter to the usual 13 weeks in the second quarter.  Revenue per week was up 10% sequentially.  We had strong execution from Exar's core business, as non-

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

GAAP EPS from continuing operations came in at $0.08 for the second quarter in a row, despite the one less work week.

32.    On February 1, 2017, Exar issued a press release wherein it reported its financial results for the Company's fiscal year 2017 third quarter, which ended on January 1, 2017.  Third quarter net sales were $27.2 million, which increased 7.6% from the $25.3 million from the same period a year ago.  Non-GAAP net income of $3.4 million increased $2.5 million from the $0.9 million reported in the third quarter of fiscal 2016.  Additionally, non-GAAP diluted earnings per share were $0.07, compared to the $0.02 reported in the third period a year ago. With respect to the results, Individual Defendant Benton commented:

> Exar again delivered solid results for the third fiscal quarter of 2017.  Sales grew 7.6% compared to the third quarter of fiscal 2016. Our financial results include reaching a non-GAAP gross margin of 53.4%, up 730 basis points from the same period a year ago, and at a level not seen at Exar in almost a decade.
>
> Our financial results reflect the success we are having in executing on our strategy. We are seeing the benefits of partnering with tier-one technology leaders to deliver high-value advanced power management and interface technology solutions.  At the same time we have made tremendous improvements in our competitiveness by increasing the efficiency of our Company's supply chain.  Both of these efforts offer additional efficiencies going forward, and I am pleased with our continued progress.

33.    Nevertheless, the Board caused the Company to enter into the Merger Agreement, pursuant to which Exar will be acquired for inadequate consideration.

34.    The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals.  Sections 7.1 and 7.2(a) of the Merger Agreement state:

> 7.1 Termination of Existing Discussions. Immediately following the execution and delivery of this Agreement, the Company shall immediately cease and cause to be terminated, and shall cause its respective directors, officers, employees, Subsidiaries, controlled Affiliates, investment bankers, attorneys and other advisors and representatives (collectively, "Representatives") to immediately cease and cause to be terminated, any and all existing activities, discussions or negotiations with any Persons conducted heretofore with respect to any inquiry, proposal, offer, indication of interest or transaction that constitutes or could

6

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

reasonably be expected to lead to, an Acquisition Proposal or Acquisition Transaction. The Company shall (a) promptly request that all confidential information that has been delivered, provided or furnished to a third party by or on behalf of the Company, within the one-year period prior to the date hereof (whether or not pursuant to a binding confidentiality, non-disclosure or other similar agreement) in connection with any consideration, discussions or negotiations regarding a potential Acquisition Proposal or Acquisition Transaction be promptly returned or destroyed by such third party and its Representatives (to the extent that the confidentiality agreement, non-disclosure or similar agreement between the third party and the Company or Parent, as the case may be, provided for such Representatives to comply with the foregoing), and (b) immediately terminate all physical and electronic data room access previously granted to any such third party or its Representatives.

7.2 No Solicitation or Facilitation of Acquisition Proposals. (a) At all times during the period commencing with the execution and delivery of this Agreement and continuing until the earlier to occur of the termination of this Agreement pursuant to Section 10.1 and the Effective Time, the Company shall not (nor shall it authorize or permit its Representatives to), directly or indirectly:

(i) solicit, initiate, induce, knowingly encourage or knowingly facilitate the making, submission or announcement of, any inquiry, proposal, offer, indication of interest or transaction that constitutes or would reasonably be expected to lead to, an Acquisition Proposal or Acquisition Transaction;

(ii) furnish to any Person (other than Parent, Merger Sub or their respective designees) any non-public information relating to the Company or any of its Subsidiaries, or afford access to its business, properties, assets, books or records, or the business, properties, assets, books or records of any of its Subsidiaries, to any Person (other than to Parent, Merger Sub or their respective designees), in a manner intended to assist or facilitate any inquiry, proposal, offer, indication of interest or transaction that constitutes or would reasonably be expected to lead to, an Acquisition Proposal or Acquisition Transaction, or take any other action intended to assist or facilitate any inquiries or the making of any inquiry, proposal, offer, indication of interest or transaction that constitutes or would reasonably be expected to lead to, an Acquisition Proposal or Acquisition Transaction;

(iii) participate or engage in discussions or negotiations with any Person (other than Parent, Merger Sub or their respective designees) with respect to any inquiry, proposal, offer, indication of interest or transaction that constitutes or would reasonably be expected to lead to, an Acquisition Proposal or Acquisition Transaction other than to contact such Person to request that such Person clarify the terms and conditions of any Acquisition Proposal (solely to the extent that such an Acquisition Proposal would reasonably require such clarification with respect to one or more ambiguous terms contained therein);

(iv) approve, endorse or recommend an Acquisition Proposal or Acquisition Transaction;

(v) enter into any letter of intent, memorandum of understanding or other Contract contemplating or otherwise relating to an Acquisition Proposal or Acquisition Transaction (other than any confidentiality agreement entered into in accordance with Section 7.3);

(vi) except where failure to do so would reasonably be expected to be inconsistent with the fiduciary duties of the Company Board, under Delaware Law, terminate, amend or waive, or fail to enforce, any rights under any "standstill" or other similar Contract between it or any of its Subsidiaries and any Person (other than Parent or Merger Sub hereto);

(vii) waive the applicability of Section 203 of the DGCL, or any portion thereof, to any Person (other than Parent or Merger Sub); or

(viii) propose publicly or agree to any of the foregoing with respect to an Acquisition Proposal.

35.     Further, the Company must promptly advise MaxLinear of any proposals or inquiries received from other parties.  Section 7.2(b) of the Merger Agreement states:

(b) In addition to the obligations set forth in Section 7.2(a) , the Company shall promptly, and in all cases within forty-eight (48) hours of receipt by it or any of its directors, officers (i.e. Vice President and above), financial advisors or outside counsel, or, within forty-eight (48) hours of the Company's knowledge of receipt by any of its Representatives (other than its directors, officers (i.e. Vice President and above), financial advisors or outside counsel), as the case may be, advise Parent orally and in writing of (i) any Acquisition Proposal it receives (either directly or through any of its Representatives), (ii) any request for information it receives (either directly or through any of its Representatives) that would reasonably be expected to lead to an Acquisition Proposal or an Acquisition Transaction, or (iii) any inquiry it receives with respect to, or which would reasonably be expected to lead to, any Acquisition Proposal or Acquisition Transaction, a summary of the material terms and conditions of such Acquisition Proposal, Acquisition Transaction, request or inquiry (including copies of all written materials comprising or relating thereto), and the identity of the Person or group making any such Acquisition Proposal, request or inquiry.

36.     Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants MaxLinear a "matching right" with respect to any "Superior Proposal" made to the Company.  Section 7.4(a) of the Merger Agreement provides, in relevant part:

7.4 Board Recommendation. (a) Subject to the terms of this Section 7.4, neither the Company Board nor any committee thereof shall (A)  withhold, withdraw, amend, modify, qualify or condition, or publicly propose to withhold, withdraw, amend, modify, qualify or condition the Company Board Recommendation or (B) approve, endorse or recommend an Acquisition Proposal or Acquisition Transaction ("Company Board Recommendation Change"); provided, however, that notwithstanding the foregoing, at any time prior to the Acceptance Time, the Company Board may effect a Company Board Recommendation Change with respect to a Superior Proposal or Intervening Event if and only if either:

(i) (A) the Company has received an unsolicited, bona fide written Acquisition Proposal that the Company Board has determined in good faith (after consultation

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

with its financial advisor of nationally recognized standing and its outside counsel) constitutes a Superior Proposal, (B) such Acquisition Proposal did not result from or arise out of a material breach or violation of any provisions of Section 7.1, Section 7.2, Section 7.3 or Section 7.4 by the Company and the Person from whom the Company received such Acquisition Proposal has not made any other Acquisition Proposals (either alone or together with one or more other Persons) to the Company that resulted from or arose out of a material breach or violation of any provisions of Section 7.1, Section 7.2, Section 7.3, or Section 7.4 by the Company, (C) the Company has not materially breached or violated any of the provisions of Section 7.1, Section 7.2, Section 7.3, or Section 7.4, in respect of such Acquisition Proposal (and any other Acquisition Proposals made by the same Person making such Acquisition Proposal, whether alone or together with one or more other Persons), (D) prior to effecting such Company Board Recommendation Change , the Company shall have given Parent at least five (5) business days' prior written notice of the intent to take such action (which notice shall not, by itself, constitute a Company Board Recommendation Change), which notice shall attach such Superior Proposal, the definitive agreement with respect thereto and state expressly the identity of the Person making such Superior Proposal and a summary of all the material terms and conditions of such Superior Proposal in reasonable detail, to the extent not included in the definitive agreement (the "Pre-Recommendation Change Notice"), and shall give Parent the opportunity to meet and discuss in good faith potential amendments or other modifications to the terms and conditions of this Agreement so that the Offer, the Merger and other transactions contemplated by this Agreement may be effected, (E) Parent shall not have made, within the foregoing five (5) business days after receipt of the Pre-Recommendation Change Notice, a counteroffer or proposal that the Company Board determines in good faith (after consultation with its financial advisor of nationally recognized standing and its outside legal counsel) is at least as favorable to its stockholders as such Superior Proposal, and (F) after such discussions, the Company Board determines in good faith (after consultation with its outside legal counsel and after considering in good faith any counteroffer or proposal made by Parent pursuant to the immediately preceding clause (E)) that the failure to effect such Company Board Recommendation Change would be reasonably likely to constitute a breach of its fiduciary duties under Delaware Law (it being agreed that every subsequent revision or modification to price or consideration of any other material revision or material modification to any such Superior Proposal shall require a new written notice thereof by the party proposing to take such action to the other party, as the case may be, pursuant to the preceding clause (D) and a new five (5) business day "matching" period under the preceding clauses (D) and (E) following the initial five (5) business day "matching" period)[.]

37.    Further locking up control of the Company in favor of MaxLinear, the Merger Agreement provides for a "termination fee" of $24,800,000, payable by the Company to MaxLinear if the Individual Defendants cause the Company to terminate the Merger Agreement. The Company may also be required to reimburse up to $3,000,000 of MaxLinear's out-of-pocket expenses.

38.    By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

competing offers for the Company.

39.    Additionally, the Company's officers and directors, as well as Alonim Investments Inc. ("Alonim") and Simcoe Capital ("Simcoe"),[1] entered into a support agreement (the "Support Agreement"), pursuant to which they have agreed to tender their Company shares in the tender offer.  As a result of the Support Agreement, approximately 20% of the Company's shares are already locked up in favor of the Proposed Transaction.

40.    The $13.00 per share merger consideration to be paid to plaintiff and the Class in the Proposed Transaction is inadequate.

41.    Among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

42.    The merger consideration also fails to adequately compensate the Company's stockholders for the significant synergies that will result from the merger.  According to the press release announcing the Proposed Transaction, MaxLinear expects to realize annualized run-rate synergies of $15 million within 12 months of the closing of the Proposed Transaction.

43.    Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

44.    Meanwhile, certain of the Company's officers and directors stand to receive substantial benefits as a result of the Proposed Transaction.  Among other things, Individual Defendant Benton stands to receive over $4.7 million in connection with the Proposed Transaction.  The Company's two other named executive officers stand to receive nearly $3 million.

***The Solicitation Statement Omits Material Information, Rendering It False and Misleading***

45.    Defendants filed the Solicitation Statement with the SEC in connection with the

---

[1]  Alonim is an affiliate of Future Electronics Inc. ("Future"), the Company's largest distributor, and Individual Defendant Guilbault is Executive Vice President and Chief Financial Officer of Future.  Additionally, Individual Defendant Jacobowitz is the founder and a Managing Partner of Simcoe.

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Proposed Transaction.

46.     The Solicitation Statement omits material information regarding the Proposed Transaction, which renders the Solicitation Statement false and misleading.

47.     First, the Solicitation Statement omits material information regarding the Company's financial projections and the financial analyses performed by the Company's financial advisor, Cowen and Company, LLC ("Cowen").

48.     With respect to Exar's financial projections, the Solicitation Statement fails to disclose: (i) taxes; (ii) capital expenditures; (iii) increases in net working capital; (iv) net operating losses; (v) tax benefits and credits; (vi) gain upon closing sale-leaseback of the Company's corporate headquarters; (vii) impairment charges; (viii) merger and acquisition and related integration costs; and (ix) restructuring charges and exit costs.

49.     With respect to Cowen's *Discounted Cash Flow Analysis*, the Solicitation Statement fails to disclose: (i) the present value of the Company's estimated United States federal and California state net operating loss carry forwards; (ii) the projected unlevered free cash flow utilized by Cowen in its analysis as well as its corresponding definition and constituent line items; and (iii) the terminal value of the Company.

50.     With respect to Cowen's *Analysis of Selected Publicly Traded Companies*, the Solicitation Statement fails to disclose the individual multiples and financial metrics for the companies observed by Cowen.

51.     With respect to Cowen's *Analysis of Selected Transactions*, the Solicitation Statement fails to disclose the individual multiples and financial metrics for the transactions observed by Cowen.

52.     The disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.  Moreover, when a banker's endorsement of the fairness of a transaction is touted to stockholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must

1    also be fairly disclosed.

2        53.    The omission of this material information renders the Solicitation Statement false

3    and misleading, including, *inter alia*, the following section of the Solicitation Statement: "Item 4.

4    The Solicitation or Recommendation."

5        54.    Second, the Solicitation Statement omits material information regarding potential

6    conflicts of interest of the Company's officers and directors.

7        55.    Specifically, the Solicitation Statement fails to disclose the timing and nature of

8    all communications regarding future employment and/or directorship of Exar's officers and

9    directors, including who participated in all such communications.

10       56.    Communications regarding post-transaction employment during the negotiation of

11   the underlying transaction must be disclosed to stockholders.  This information is necessary for

12   stockholders to understand potential conflicts of interest of management and the Board, as that

13   information provides illumination concerning motivations that would prevent fiduciaries from

14   acting solely in the best interests of the Company's stockholders.

15       57.    The omission of this material information renders the Solicitation Statement false

16   and misleading, including, *inter alia*, the following sections of the Solicitation Statement:

17   (i) "Item 3. Past Contacts, Transactions, Negotiations and Agreements"; and (ii) "Item 4. The

18   Solicitation or Recommendation."

19       58.    Third, the Solicitation Statement omits material information regarding the

20   background of the Proposed Transaction.  The Company's stockholders are entitled to an

21   accurate description of the "process" the directors used in coming to their decision to support the

22   Proposed Transaction.

23       59.    For example, the Solicitation Statement fails to disclose the circumstances

24   surrounding Company A's decision to no longer pursue a transaction with Exar on April 17,

25   2015, despite having negotiated the terms of definitive merger agreement.

26       60.    The Solicitation Statement fails to disclose the terms and value of the indication

27   of interest to acquire Exar as discussed at the February 18, 2017 Board meeting.

28       61.    The Solicitation Statement fails to disclose whether Exar representatives

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

1   responded to Company D's February 21, 2017 expression of interest, and/or whether Company

2   D subsequently contacted Exar regarding a potential transaction.

3       62.     The Solicitation Statement also fails to disclose the reasons the Board met on

4   March 9 and March 26, 2017 outside of the presence of Individual Defendant Guilbault, as he

5   does not "meet[] the standards of an independent director under applicable regulations," but

6   included Individual Defendant Guilbault in all other Board meetings during the process leading

7   up to the Merger Agreement, including the March 28, 2017 meeting during which the Board

8   approved the Proposed Transaction.

9       63.     The omission of this material information renders the Solicitation Statement false

10  and misleading, including, *inter alia*, the following section of the Solicitation Statement: "Item 4.

11  The Solicitation or Recommendation."

12      64.     The above-referenced omitted information, if disclosed, would significantly alter

13  the total mix of information available to Exar's stockholders.

## COUNT I

### (Claim for Violation of Section 14(e) of the 1934 Act Against Defendants)

16      65.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

17      66.     Section 14(e) of the 1934 Act states, in relevant part, that:

18      It shall be unlawful for any person to make any untrue statement of a material fact
        or omit to state any material fact necessary in order to make the statements made,
19      in the light of the circumstances under which they are made, not misleading . . . in
        connection with any tender offer or request or invitation for tenders[.]

20

21      67.     Defendants disseminated the misleading Solicitation Statement, which contained

22  statements that, in violation of Section 14(e) of the 1934 Act, in light of the circumstances under

23  which they were made, omitted to state material facts necessary to make the statements therein

24  not misleading.

25      68.     The Solicitation Statement was prepared, reviewed, and/or disseminated by

26  defendants.

27      69.     The Solicitation Statement misrepresented and/or omitted material facts in

28  connection with the Proposed Transaction as set forth above.

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

70.     By virtue of their positions within the Company and/or roles in the process and the preparation of the Solicitation Statement, defendants were aware of this information and their duty to disclose this information in the Solicitation Statement.

71.     The omissions in the Solicitation Statement are material in that a reasonable stockholder will consider them important in deciding whether to tender their shares in connection with the Proposed Transaction.  In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available.

72.     Defendants knowingly or with deliberate recklessness omitted the material information identified above in the Solicitation Statement, causing statements therein to be materially incomplete and misleading.

73.     By reason of the foregoing, defendants violated Section 14(e) of the 1934 Act.

74.     Because of the false and misleading statements in the Solicitation Statement, plaintiff and the Class are threatened with irreparable harm.

75.     Plaintiff and the Class have no adequate remedy at law.

## COUNT II

### (Claim for Violation of 14(d) of the 1934 Act Against Defendants)

76.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

77.     Section 14(d)(4) of the 1934 Act states:

Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

78.     Rule 14d-9(d) states, in relevant part:

Any solicitation or recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making such solicitation or recommendation and the information required by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair and adequate summary thereof[.]

Item 8 requires that directors must "furnish such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading."

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

79.     The Solicitation Statement violates Section 14(d)(4) and Rule 14d-9 because it omits the material facts set forth above, which renders the Solicitation Statement false and/or misleading.

80.     Defendants knowingly or with deliberate recklessness omitted the material information set forth above, causing statements therein to be materially incomplete and misleading.

81.     The omissions in the Solicitation Statement are material to plaintiff and the Class, and they will be deprived of their entitlement to make a fully informed decision with respect to the Proposed Transaction if such misrepresentations and omissions are not corrected prior to the expiration of the tender offer.

82.     Plaintiff and the Class have no adequate remedy at law.

## COUNT III

### (Claim for Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants and MaxLinear)

83.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

84.     The Individual Defendants and MaxLinear acted as controlling persons of Exar within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of Exar and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Solicitation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

85.     Each of the Individual Defendants and MaxLinear was provided with or had unlimited access to copies of the Solicitation Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

86.     In particular, each of the Individual Defendants had direct and supervisory

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.  The Solicitation Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.  They were thus directly connected with and involved in the making of the Solicitation Statement.

87.     MaxLinear also had direct supervisory control over the composition of the Solicitation Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Solicitation Statement.

88.     By virtue of the foregoing, the Individual Defendants and MaxLinear violated Section 20(a) of the 1934 Act.

89.     As set forth above, the Individual Defendants and MaxLinear had the ability to exercise control over and did control a person or persons who have each violated Section 14(e) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.

90.     As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

91.     Plaintiff and the Class have no adequate remedy at law.

### PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.     Enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.     In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.     Directing the Individual Defendants to file a Solicitation Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

1    D.      Declaring that defendants violated Sections 14(e), 14(d), and 20(a) of the 1934

2  Act, as well as Rule 14a-9 promulgated thereunder;

3    E.      Awarding plaintiff the costs of this action, including reasonable allowance for

4  plaintiff's attorneys' and experts' fees; and

5    F.      Granting such other and further relief as this Court may deem just and proper.

6
7                              **JURY DEMAND**

8    Plaintiff hereby demands a trial by jury.

9  Dated:  April 18, 2017                          **LEVI & KORSINSKY LLP**

10                                  By:   _/s/ Rosemary M. Rivas_
                                         Rosemary M. Rivas
11                                       44 Montgomery Street, Suite 650
                                         San Francisco, CA 94104
12                                       Telephone: (415) 291-2420
                                         Facsimile: (415) 484-1294
13
                                         *Attorneys for Plaintiff*
14

15  **OF COUNSEL:**

16  **RIGRODSKY & LONG, P.A.**
    Brian D. Long (to be admitted *pro hac vice*)
17  Gina M. Serra (to be admitted *pro hac vice*)
    2 Righter Parkway, Suite 120
18  Wilmington, DE 19803
    Telephone: (302) 295-5310
19  Facsimile: (302) 654-7530

20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934